UNITED STATES of America, Plaintiff-Appellee,

v.

Skeeter CYPHERS and David Willman, Defendants-Appellants.

Nos. 76–1438, 76–1439.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1976.

Decided April 21, 1977.

Chester L. Blair, Richard F. Walsh, Federal Defender Program, Chicago, Ill., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., James R. Streicker, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, PELL and BAUER, Circuit Judges.

BAUER, Circuit Judge.

Following a jury trial, defendants-appellants were convicted of the armed robbery of an Erie, Illinois bank and sentenced to prison terms of eight years each for violating 18 U.S.C. §§ 2113(a) and (d).

Defendant Cyphers argues on appeal that his rights under the double jeopardy clause were violated when he was retried following a mistrial. Cyphers also assigns as error the district court's refusal to permit him access to a presentence report sought for the purpose of impeaching a government witness, as well as the court's admission of testimony concerning a narcotics transaction between Cyphers and a government informer.

Defendant Willman contends that the circumstantial evidence on which he was convicted was insufficient to support the jury's verdict, and that the trial court erred in not questioning the jurors sua sponte as to

whether they knew why a fellow juror had been excluded from the panel after the trial had begun.

Finally, both defendants argue that the trial court erred in admitting opinion testimony based on a government expert's microscopic comparison of hair samples.

We affirm the defendants' convictions for the reasons noted below.

## I.

Prior to the defendants' first joint trial, Willman moved for a severance stating that the Government was planning to call a witness to testify to an incriminating admission made by Cyphers that would incriminate Willman as well. Under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), such testimony would be inadmissible in a joint trial unless redacted so as not to incriminate Willman. Instead of granting a severance, the district court permitted the Government to instruct its witness to substitute the word "partner" when testifying to Cyphers' references to Willman. The attempted use of redacted testimony failed, however, when the witness mentioned Willman's name during his testimony at trial. Willman moved for a mistrial. Cyphers, however, refused to join his codefendant's motion and objected to proceeding with the trial alone. Cyphers believed that he would be substantially prejudiced by a separate trial because he had already informed the jury that he would rely on a joint alibi defense, and he was concerned that certain defense witnesses, including Willman himself, might not testify at a separate trial.

The district court then advised Cyphers that his objection to proceeding with the trial alone would be construed as a motion for a mistrial and a waiver of any double jeopardy claim he might raise to prevent a retrial. The district court, after receiving assurances from Cyphers that he had consulted with counsel on the matter and understood the possible consequences of adhering to his objection to a separate trial, declared a mistrial as to both defendants.

Prior to the defendants' second joint trial. Cyphers moved to dismiss his indictment on double jeopardy grounds. Adhering to his admonition that he would treat Cyphers' objection to proceeding with his first trial as an implied motion for a mistrial and a waiver of his double jeopardy claim, the district judge denied the motion.

Cyphers argues on appeal that the district court should have dismissed his indictment because he neither moved for, nor caused, the mistrial. He blames the Government's choice of trial tactics for the mistrial and contends that he should not have been forced to make the Hobson's Choice of either waiving his constitutional rights under the double jeopardy clause or else risking substantial prejudice to his defense by withdrawing his objection to being tried alone.

The Government answers that the district court was correct in treating Cyphers' objection to a separate trial as an implied motion for a mistrial and a waiver of his double jeopardy claim. Stressing that the mistrial was necessitated by no prosecutorial overreaching or judicial misconduct, but rather by an inadvertent slip-up of a properly instructed witness, the Government says that, if the district judge had not acted as he did, it would have been faced with the equally difficult choice of having either to dismiss Cyphers' indictment or else to defend against the due process claim that Cyphers would now be raising on appeal had he been forced to trial alone.

We agree with Cyphers that, by standing on his objection to proceeding with the trial alone, he did not forfeit his right to claim double jeopardy on retrial. He was entitled to assert both his right to a fair trial and his "valued right" to have his trial completed before the first jury empaneled to determine his guilt or innocence. *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949). He should not be penalized for asserting one of his constitutional rights by being forced to waive another. Cf. *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Accordingly, we hold that Cyphers'

refusal to proceed to trial alone did not constitute an implied motion for a mistrial and a waiver of his double jeopardy claim.

 We disagree, however, with Cyphers' contention that his rights under the double jeopardy clause were violated by the procedure used in this case. A defendant's "valued right" to go to the first jury must at times be subordinated to "the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter, supra* at 689, 69 S.Ct. at 837. Where a "manifest necessity" exists, trial courts are given wide latitude to declare a mistrial and order a new trial so that the ends of public justice will not be defeated by inadvertent errors[1] infecting the first proceeding. *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 1079–80, 47 L.Ed.2d 267 (1976); *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).

We believe that, in the circumstances of this case, declaration of a mistrial was manifestly necessary to serve the ends of public justice. Although we cannot say that a reversal would have been a certainty had Cyphers been convicted after being forced to proceed to trial alone, his due process objection to that procedure had sufficient merit for the trial judge, in the exercise of sound discretion, to have determined that the ends of public justice would be better served by declaring a mistrial and ordering a new trial. See *Illinois v. Sommerville*, 410 U.S. 458, 464, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). Moreover, even if not declared at Cyphers' own request, the mistrial was surely ordained for his benefit. He can hardly complain that he was "penalized" by the district court's vigilant regard for his right to a fair trial. See *Gori v. United States*, 367 U.S. 364, 366–69, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); *United States v. Gentile*, 525 F.2d 252, 255–58 (2d Cir. 1975),

*cert. denied*, 425 U.S. 903, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1975).

 The important consideration, for purposes of double jeopardy analysis, "is that the defendant retain primary control over the course to be followed in the event of . . . error." *United States v. Dinitz, supra*, at 609, 96 S.Ct. at 1081. The district court scrupulously sought Cyphers' views regarding the procedure to be followed after a mistrial as to his codefendant became necessary. Cyphers was advised by the court that he would be given a new joint trial unless he chose to proceed alone with the first trial. In so doing, the court effectively placed "primary control" over the course to be followed in Cyphers' hands. Cyphers stood on his objection and refused to join the motion for a mistrial, with full knowledge of the practical consequences of his actions.

 Because declaration of a mistrial was manifestly necessary to give Cyphers the fair trial procedure he wanted and to serve the ends of public justice, we do not believe that his rights under the double jeopardy clause were violated under the circumstances of this case.

### II.

Cyphers next argues that the district court erred in denying his motion for production of a presentence report concerning a government informer who testified to an incriminating admission made by Cyphers while he was in the Metropolitan Correctional Center awaiting trial. Cyphers believes he was denied the effective assistance of his counsel because the federal presentence report may have contained information useful in cross-examining and impeaching the witness. He says that, even if the report was not technically in the hands of

---

1. We would have a different case, of course, if calculated prosecutorial misconduct necessitated the mistrial. Though the prudence of the Government's choice of trial tactics might now be second-guessed, the Government was entitled to try the defendants jointly and to attempt to resolve the *Bruton* problem by instructing its witness to redact his testimony. The witness's inadvertent failure to do so does not, in our opinion, render the Government vicariously liable for the mistrial or constitute the sort of overreaching that alone would mandate dismissal of Cyphers' indictment on retrial. See *United States v. Di Silvio*, 520 F.2d 247, 250 (3d Cir. 1975); Note, *Mistrial and Double Jeopardy*, 49 N.Y.U.L.Rev. 937, 951 (1974).

the prosecution and thus was immune from production under Rule 32 of the Federal Rules of Criminal Procedure or *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), it was available through the good offices of the court and should have been turned over because it was necessary to prepare his defense.

◼ We have previously noted the critical importance of maintaining the confidentiality of presentence reports and have refused to require their production. E. g., *United States v. Greathouse,* 484 F.2d 805, 807 (7th Cir. 1974). Nevertheless, there may be some circumstances wherein disclosure of a presentence report may be absolutely essential to effective presentation of a defense and therefore required in the interests of justice. E. g., *United States v. Figurski,* 545 F.2d 389, 391–92 (4th Cir. 1976); *Hancock Bros., Inc. v. Jones,* 293 F.Supp. 1229, 1233 (N.D.Cal.1968). We need not decide here, however, whether and under what circumstances disclosure of a presentence report might be required, for we are convinced that Cyphers was not prejudiced by his inability to obtain the report he sought in this case.

◼ When Cyphers first requested the federal presentence report, the trial judge stated that he would attempt to obtain a copy of the report from the district judge for whom it was prepared. The trial judge indicated that he would make the report available to both sides if, after an in camera review, he believed it contained material helpful to the defense. The report was voluntarily released to the trial judge.[2] He determined that it contained no material that would assist Cyphers in impeaching the witness, and he so informed defense counsel prior to direct examination of the witness. Such a procedure sufficiently protected Cyphers from prejudice due to the nondisclosure of the report. *United States v. Figurski, supra* at 392.

Moreover, Cyphers did have available at trial a 1975 state psychiatric evaluation of the witness that found the witness emotionally unstable, manipulative, suicidal and unreliable. Our review of the record reveals that Cyphers' counsel made effective use of that report on cross-examination to impeach the witness's credibility and later placed the report into evidence. Any damaging information that might have been contained in the federal presentence report could not have been any more useful for impeachment purposes than the findings of the recent state psychiatric evaluation of the witness.

Under these circumstances, we do not believe Cyphers was denied the effective assistance of his counsel by reason of his inability to obtain access to the federal presentence report.

### III.

Cyphers next argues that the district court erred in admitting testimony that Cyphers asked a government informer to purchase $1000 worth of heroin for him shortly after the robbery occurred—evidence offered to show Cyphers' motive for the robbery. Cyphers contends that this "other crime" evidence was inadmissible under the standards set out in *United States v. Ostrowsky,* 501 F.2d 318, 321 (7th Cir. 1974), which permits the use of "other crime" evidence only if (1) it fits within an exception recognized by Rule 404(b) of the Federal Rules of Evidence, (2) its probative value outweighs its prejudicial effects, and (3) it is clear and convincing.

◼ We believe the requirements for admission of "other crime" evidence set out in *Ostrowsky* were met here. First, Rule 404(b) expressly contemplates the use of such evidence to prove motive even if only a general intent crime is charged. See *United States v. Braasch,* 505 F.2d 139, 149 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). Second, the record reveals that the witness's testimony was highly probative both of Cyphers' motive for the robbery and of his participation in it. Moreover, whatever prejudicial

---

**2.** We intimate no views as to whether one district court judge has the power to order another district judge to release a presentence report in his possession.

impact Cyphers' use of drugs may have had on the jury could not have been cured by suppression of the testimony, for Cyphers' use of drugs had been mentioned by both sides earlier in the trial without objection by the defense. Accordingly, we are convinced that the district judge did not abuse his discretion in determining that the probative value of this testimony outweighed its possible prejudicial impact. *Id.* at 149. Finally, we believe the witness's testimony regarding Cyphers' participation in the narcotics transaction was clear and convincing. Cyphers suggests the witness's credibility was so suspect that his testimony could never be regarded as clear and convincing. Assessment of witness credibility, however, is a matter committed initially to the trial judge and ultimately to the jury, not to us on appeal. We review the clear and convincing character of "other crime" evidence only to determine whether a sufficient factual basis exists for its use. Here, the witness's testimony was detailed, corroborated by other evidence introduced at trial, and essentially unimpeached. If the witness was to be believed, his testimony was sufficiently clear and convincing regarding Cyphers' involvement in the heroin buy to meet the third prong of the *Ostrowsky* test.

### IV.

Willman's principal argument on appeal is that the district court erred in not granting his motion for a directed acquittal predicated on the Government's failure to present evidence sufficient to establish his guilt. Willman notes that the evidence against him is wholly circumstantial and believes the jury convicted him only because he was tried with Cyphers, who, according to several witnesses, admitted committing the robbery with a partner.

We agree that the evidence presented against Willman was essentially circumstantial. That the evidence was circumstantial, however, did not impair its probative value. *United States v. Wigoda,* 521 F.2d 1221, 1225 (7th Cir. 1975), *cert. denied,* 421 U.S. 949, 96 S.Ct. 1421, 47 L.Ed.2d 355 (1976). Moreover, any inference of Will-

man's guilt the jury drew from Cyphers' admission of guilt stemmed not from the fact that the defendants were tried together, but rather from the fact that Willman linked his fate with Cyphers' by arguing a joint alibi defense to the jury. In view of the testimony that Cyphers admitted committing the robbery, the jury was entitled to reject Willman's alibi defense and infer his guilt, not because Willman was on trial with Cyphers, but because Willman said he was with Cyphers at the time the bank was robbed. Even if we were to exclude the inference of guilt permitted by Willman's admission that he was with Cyphers before, during and after the robbery, we believe the other evidence linking Willman to the crime was in itself sufficient to withstand a motion for a directed acquittal.

Because the robbers wore masks, no positive eyewitness identification of the robbers was ever made. Willman, however, did fit the general descriptions given of one of the robbers as to race, height, build and hair length and coloring. Moreover, the getaway car used in the robbery was registered to Willman's brother-in-law. Owned at the time of the robbery by Willman's father, the car was kept on a farm outside Erie. Willman says that anyone could have used the car in the robbery because the ignition key was habitually left in the car. Nevertheless, whoever used the car must have been aware that it had to be coaxed into starting, for a new battery to jump the car and a beer can half-full of gasoline were found near the place where the car was kept. Willman testified that he knew where the car was parked and was aware of its mechanical deficiencies. Furthermore, a green duffel bag used by the robbers was recovered in a farmhouse frequented by Willman, and the authorities found on the bag a human head hair "microscopically like" head hairs taken from Willman and unlike hairs taken from the residents of the farmhouse and other suspects in the case.

Finally, the most damaging "circumstantial" evidence came from Willman's own mouth. Authorities had questioned Willman on the day of the robbery. The next

day, he went to Colorado to visit his ex-wife. During his visit, Willman's ex-wife told him that Ronald Reglin, a mutual friend of Willman and Cyphers, was trying to get in touch with him. Willman then called Reglin in Illinois and was heard by his ex-wife to ask Reglin, "Where's Skeeter [Cyphers]? Did they find the suitcase? What about the car?" Willman's ex-wife testified that, after the conversation, Willman appeared to be very nervous and distraught.

To be sure, if we had to rely solely on any single strand of the above evidence, we might have some difficulty in holding that it was sufficient as a matter of law to support Willman's conviction. We are convinced, however, that the above evidence was sufficient for a rational tier of fact to have found Willman guilty beyond a reasonable doubt, when the evidence is considered together and viewed in the light most favorable to the Government, along with all reasonable inferences that may be drawn therefrom. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

### V.

▮ Willman next contends that the district court erred in not questioning the jurors sua sponte as to whether they knew why a fellow juror had been excluded from the panel after the trial had begun. The juror's exclusion resulted from his admission to the court that one of the defense attorneys had approached the juror's wife during a lunch recess. The juror told the court that he did not know what his wife and the attorney had discussed, and that he had mentioned the incident only to the marshall. After admonishing the juror not to discuss the matter with anyone else, the district court excused the juror from the courtroom and asked the marshall what the juror had related. The marshall stated that the juror had said that one of the lawyers was trying "to put the make on" his wife. At the joint motion of the Government and defense counsel, the court excluded the juror from the panel for cause and again ad-

monished him not to mention the incident or the reason for his exclusion to the other members of the jury. The juror assured the court that he had not mentioned the incident to the jury and would not.

Willman now contends on appeal that the district court should have polled the members of the jury to determine if any of them knew why the juror had been excluded. Willman says that the juror's failure to inform the court of the suspicions communicated to the marshall called into question the credibility of the juror's assurances that he had not related the incident to anyone but the marshall. Accordingly, he says, the district judge was under a duty to poll the jury himself, even absent a motion to do so from defense counsel. Willman says he should receive a new trial because the jury might have been infected by prejudice against his counsel that might have carried over against himself. Given the possibility of prejudice, Willman contends he was denied a fair trial.

We disagree. The chain of inferences upon which Willman builds his argument of prejudice is wholly speculative. If the discrepancies between the excluded juror's testimony and the marshall's testimony gave real cause for concern that the jury had been infected by prejudice, counsel would surely have moved the court to poll the jury at the time the discrepancies became apparent. Absent a timely motion to poll the jury, the assigned error is not now subject to review. *United States v. Calhoun,* 510 F.2d 861, 870 (7th Cir. 1975), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1683, 44 L.Ed.2d 104 (1975). We do not believe the district court committed plain error in not questioning the jury sua sponte under the circumstances.

### VI.

Finally, both Cyphers and Williams argue that the district court erred in admitting opinion testimony of a government witness that hairs recovered from articles used by the robbers were "microscopically like" hair samples taken from the defendants. According to the witness, "microscopically

like" means that the hairs found on the items used in the robbery definitely "could have come" from the defendants, but that there was an insufficient basis for saying that the hairs did come from the defendants.

The defendants argue that the witness's opinion testimony was inadmissible because (1) it was so speculative as to be irrelevant and prejudicial; (2) it was not based on a reasonable scientific certainty; and (3) the Government failed to prove a chain of custody sufficient to protect the reliability of the physical evidence upon which the testimony was based.

 We do not believe the trial judge erred in finding that the opinion testimony at issue met the requirements of Rule 702 of the Federal Rules of Evidence. The witness was properly qualified as an expert, and the subject matter of his testimony—microscopic comparison of hair samples—was beyond the ken of the ordinary layman. Trial judges are given broad discretion to determine the qualifications of expert witnesses and to decide whether expert testimony may assist the jury's deliberations. *United States v. Dellinger,* 472 F.2d 340, 382–83 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1972). We do not believe the trial judge abused his discretion here.

 The same result obtains concerning defendants' argument that the opinion testimony was irrelevant and that its probative value was outweighed by its prejudicial effects. Trial judges are given wide latitude in making such determinations, and their rulings will not be overturned except for an abuse of discretion. *Construction, Ltd. v. Brooks-Skinner Bldg.*

*Co.,* 488 F.2d 427, 431 (3d Cir. 1973). Here, the expert's opinion that the hairs found on items used in the robbery "could have come" from the defendants was entitled to be admitted for whatever value the jury might give to it. The weight to be assigned the opinion in view of the expert's admission that the hairs could also have come from persons other than the defendants was a matter for the jury to determine. Where a witness properly qualified as an expert bases his opinion on what he believes to be a reasonable scientific inference, his opinion should ordinarily be admitted subject to cross-examination concerning the propriety of the testing technique used and the validity of the conclusions drawn from his observations. *United States v. Stifel,* 433 F.2d 431, 438 (6th Cir. 1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); *Twin City Plaza, Inc. v. Central Surety Ins. Co.,* 409 F.2d 1195, 1203 (8th Cir. 1969).

 Alternatively, defendants argue that the testimony was · inadmissible because it was not "to" a reasonable scientific certainty. As we understand their rather opaque argument, defendants appear to be saying that an expert's opinion testimony must be expressed in terms of a reasonable scientific certainty in order to be admissible. There is no such requirement. *United States v. Longfellow,* 406 F.2d 415, 416 (4th Cir.), *cert. denied,* 394 U.S. 998, 89 S.Ct. 1594, 22 L.Ed.2d 776 (1969); 3 *Weinstein's Evidence* ¶ 702[02], at 702–13. To the extent that *State v. Holt,* 17 Ohio St.2d 81, 246 N.E.2d 365 (1969), expresses a contrary view, we find it unpersuasive.[3] We adhere to the rule that an expert's lack of absolute certainty goes to the weight of his testimo-

---

**3.** We note that *Holt* involved an expert witness who opined a *conclusion* on a crucial issue of contested fact. The Ohio court drew its "reasonable scientific certainty" requirement from cases wherein experts were offering opinion testimony on an ultimate issue of fact within the province of the jury, namely, an opinion on whether an injury was the proximate cause of a disability for which plaintiff sought workmen's compensation. Because of the danger that a jury might be improperly influenced by

awe of scientific expertise to subordinate its own judgment on a contested issue of ultimate fact to that of the expert, perhaps the Ohio court had reason to require a greater degree of certainty on the part of the expert as a predicate to the admissibility of his testimony than it would in a case such as this, where the expert offered no conclusion that the hairs did come from the defendants, but rather testified only that the hairs "could have come" from the defendants.

ny, not to its admissibility. *United States v. Wilson*, 441 F.2d 655, 656 (2d Cir. 1971).

Finally, Cyphers contends that the expert opinion testimony was inadmissible because the hair exhibits upon which the testimony was based *may* have fallen on the garments from which they were removed after, rather than before, the garments were discovered by the authorities. As a basis for his suggestion that the exhibits underlying the expert testimony may have been contaminated, Cyphers points to a two-to-three hour gap between the time of the garments' discovery and the time they were sealed in plastic bags. In short, Cyphers suggests that the hairs recovered from the garments may have fallen from some third party other than the robbers, during the time the garments were in the custody of the authorities but unsealed.

We note that the Government established a proper chain of custody for the garments from which the hair exhibits were recovered. The mere possibility that the hairs recovered from the garments might have come from a third party, rather than from one of the robbers, is, in our view, a matter that goes to the weight to be given the expert testimony, rather than to its admissibility. E. g., *United States v. Stevenson*, 445 F.2d 25, 27 (7th Cir.) *cert. denied*, 404 U.S. 857, 92 S.Ct. 108, 30 L.Ed.2d 99 (1971); see *United States v. Daughtry*, 502 F.2d 1019, 1021–23 (5th Cir. 1974).

## VII.

For the reasons noted above, we affirm the defendants' convictions.

AFFIRMED.