UNITED STATES of America, Appellee,

v.

Goody MOORE; Emmanuel
Salami, Defendants,

Emmanuel Salami, Defendant–Appellant.

No. 18, Docket 90–1524.

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1991.

Decided Nov. 15, 1991.

Gail Jacobs, Great Neck, N.Y., for defendant-appellant Salami.

Geoffrey S. Mearns, Brooklyn, N.Y., Asst. U.S. Atty. E.D. New York (Andrew J. Maloney, U.S. Atty. E.D. New York, Susan Corkery, Asst. U.S. Atty., of counsel), for appellee.

Before: OAKES, Chief Judge, FEINBERG and ALTIMARI, Circuit Judges.

FEINBERG, Circuit Judge:

Emmanuel O. Salami appeals from a judgment after a jury trial in the Eastern District of New York, John R. Bartels, J., convicting Salami of conspiring to import in excess of one kilogram of heroin, importing in excess of 100 grams of heroin and possessing with intent to distribute in excess of 100 grams of heroin. Salami was sentenced to a term of imprisonment of 121 months, five years supervised release and a $150 special assessment. For the reasons set forth below, we affirm the judgment of conviction. We would ordinarily have affirmed in a summary order but for the presence of one issue which deserves fuller discussion. We write principally to address the standards and procedure to be followed when a defendant requests disclosure of the presentence report of an accomplice witness.

## I. Background

The government's case against Salami consisted mainly of the testimony of Eseimeude Shaka Momodu (Momodu) and Goody Moore Mokobia (Moore), who were both arrested with Salami but pled guilty. Based on the testimony of these witnesses, the government introduced evidence at trial from which a jury could find the following.

Salami and Momodu, who were from the same state in Nigeria, were introduced by a mutual friend in Atlanta, Georgia in April 1989. They next met at a party in July 1989, where Salami introduced Momodu to a Nigerian woman named Rita. Rita told Momodu that he could make $20,000 by transporting drugs from Nigeria to the United States for her brother-in-law, Monday Okorie. Rita also told Momodu that she would make arrangements for Salami to travel to Nigeria and that she had purchased Salami's ticket. Momodu and Salami then met at Kennedy Airport on July 27, 1989, where they boarded a flight to Lagos, Nigeria. During the flight, Momodu and Salami discussed their plans to import heroin on their return trip to the United States.

After visiting his family elsewhere in Nigeria, Momodu returned to Lagos, where he met with Rita and Okorie. Momodu also met Moore, whose role was to meet Salami and Momodu at the airport in New York and protect the heroin until Rita arrived to pick it up. The next day, Momodu went to a hotel in Lagos to visit Salami, who complained that Okorie was not giving him enough money to live on while in Lagos. During their conversation, Salami also told Momodu that he had met Moore. On one occasion, Momodu went with Salami to Okorie's office, where Salami gave Okorie his passport and green card so that

Okorie could purchase Salami's airline ticket. On August 25, 1989, Moore and Okorie went to visit Salami, and Okorie gave Salami a gray suitcase containing heroin. After inspecting the suitcase, Salami was satisfied that no one would discover that heroin was concealed in a false side. Moore then left for New York that day.

On September 2, 1989, Salami arrived at Kennedy Airport in New York where Moore met him. Salami carried the same gray suitcase that Okorie had given him in Lagos. Moore and Salami went to Moore's hotel room in New York and stayed there together until September 6. On that date, Moore and Salami went to Kennedy Airport to meet Momodu's flight. Okorie had told Momodu that Moore would meet him at the airport; Okorie had also given Momodu a suitcase with concealed heroin. A customs inspector discovered the heroin in Momodu's suitcase, and a special agent questioned him; thereafter, Momodu agreed to attempt to deliver the suitcase to Moore. Momodu then went to the arrivals area where Moore and Salami greeted him. Momodu, who was surprised to see Salami, attempted to warn him that he had been caught. All three men were arrested at a taxi stand.

Following his arrest, Salami denied knowing Momodu, though he had in his wallet a business card with Momodu's name and number on it. Salami also possessed the telephone number of Okorie's business in Lagos. Customs agents searched the room where Moore and Salami had been staying and found Salami's suitcase. The suitcase contained heroin concealed in a false side and a boarding pass for a September 2 flight from Nigeria that matched an airline ticket found in Salami's briefcase.

Salami, who testified on his own behalf, admitted that Rita paid for part of his airline ticket to Nigeria, but claimed that this payment was in exchange for carrying a baby stroller for her. Salami also admitted that when he was in Nigeria he initially agreed to transport heroin but claimed that he withdrew from the conspiracy when Okorie reduced the amount of money he was to receive from $20,000 to $10,000.

Many months before Salami's trial in August 1990, Momodu and Moore had pled guilty to a one-count information charging importation of heroin into the United States. At that time, presentence reports had been prepared for Momodu and Moore in connection with their prospective sentencing. At Salami's trial, he asked to see these reports claiming that, pursuant to 18 U.S.C. § 3500, he was entitled to be furnished those portions of the reports that related to Momodu's and Moore's testimony. The district judge examined the reports in camera and concluded that they did not contain any material that was exculpatory or that affected the credibility of the witnesses. Accordingly, the judge denied Salami's request.

## II. Discussion

### A. Release of presentence reports

On appeal, Salami renews his argument that the reports, or at least portions of them, should have been turned over to the defense. Salami again bases his claim on the Jencks Act, 18 U.S.C. § 3500, which is reproduced in the margin.[1] Salami pointedly notes that he has not seen the reports, but argues that they undoubtedly contain statements "which relate[ ] to the subject matter as to which" Momodu and Moore testified, a logical supposition.

■ This court has ruled on the precise issue of whether the Jencks Act applies to disclosure of presentence reports. In *United States v. Canniff*, 521 F.2d 565 (2d Cir.), cert. denied, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976), we flatly held

1. 18 U.S.C. § 3500 provides in relevant part:
   (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

that a presentence report "did not constitute material required to be produced by the government" under 18 U.S.C. § 3500. Our reasoning was twofold: "The Probation Office is an arm of the United States Courts ... and is not subject to the control of the U.S. Attorney. Therefore, the prosecutor had no right to or control over copies of the report. Additionally, ... the prosecution never saw or possessed the presentence report. Clearly, the government cannot be required to produce that which it does not control and never possessed or inspected." Id. at 573. Since prior opinions of a panel of this court are binding upon us in the absence of a change in the law by higher authority or our own in banc proceeding (or its equivalent),[2] the broad statement in *Canniff* that 18 U.S.C. § 3500 does not apply to presentence reports would appear to dispose of Salami's claim here.

◼ Although the United States Attorney's Office did not have access to the presentence reports in *Canniff*, in this case the United States Attorney's Office apparently did possess the presentence reports at issue; presumably, it acquired them when they were also turned over to Momodu and Moore for the purpose of sentencing. But even if *Canniff* were distinguishable, we would similarly reject Salami's claim to the reports under 18 U.S.C. § 3500. Presentence reports are prepared pursuant to the command of Rule 32(c) of the Federal Rules of Criminal Procedure, and the concern for confidentiality that permeates that Rule and its history is obvious. Under 18 U.S.C. § 3500, a defendant may obtain a statement of a witness with ease, and it cannot be that the concern for confidentiality so apparent in Rule 32(c) can be so easily overridden. The Jencks Act was enacted in 1957. At that time, disclosure of presentence reports was even more restricted than it is now. Indeed, it was not until 1975 that defendants were entitled to see their own presentence reports as a matter of right. See *United States Dep't of*

*Justice v. Julian,* 486 U.S. 1, 9, 108 S.Ct. 1606, 1612, 100 L.Ed.2d 1 (1988). It would be ironic to hold that Congress, almost two decades earlier, intended the Jencks Act to require the routine release of such reports to third parties.

Salami's inability to obtain the reports under 18 U.S.C. § 3500, however, does not end the matter. The government agrees that the district court was under an obligation to examine the presentence reports in camera—as it did—to determine whether any portions of them should be turned over to Salami. That position is undoubtedly based upon our later discussion of the subject in *United States v. Charmer Industries, Inc.,* 711 F.2d 1164 (2d Cir.1983). In that case, which did not involve 18 U.S.C. § 3500, a corporation had been indicted for violation of the Sherman Act, and had pled nolo contendere. A presentence report was thereafter prepared by the Probation Service to assist the district court in imposing sentence. Over a year later, a regulatory authority in another state sought a copy of the report in connection with civil proceedings against a related corporation. *Charmer* thus did not deal with turning over to a defendant in a criminal case a presentence report of an accomplice witness (although other courts have addressed that issue, as will be seen below). However, the court in *Charmer* thoroughly canvassed the cases dealing with release of such reports to a third person. The court held that

> in light of the nature of the presentence report as a court document designed and treated principally as an aid to the court in sentencing, we conclude that the report may not properly be disclosed without authorization by the court. Given the desirability of ensuring the free flow of information to the court and the fact that the document can and frequently does serve its principal purpose notwithstanding the presence of misstatements—on which the court simply declines to rely—or disputed statements, we conclude that the court should not

---

**2.** See, e.g., *United States v. Pujana–Mena,* 949 F.2d 24 at 31 n. 4 (2d Cir.1991) (opinion circulated to active judges of the court before filing);

*United States v. Reed,* 773 F.2d 477, 478 n. 1 (2d Cir.1985) (same).

release a presentence report to a third person unless that person has shown a compelling need for disclosure to meet the ends of justice.

Id. at 1176. The Supreme Court has also noted that "the courts have typically required some showing of a special need before they will allow a third party to obtain a copy of a presentence report." *Julian*, 486 U.S. at 12, 108 S.Ct. at 1613 (citing *Charmer*).

Other circuit courts have considered whether a presentence report of an accomplice witness or other government witnesses should be disclosed to a defendant. See *United States v. DeVore*, 839 F.2d 1330, 1332–33 (8th Cir.1988); *United States v. Anderson*, 724 F.2d 596, 598–99 (7th Cir. 1984); *United States v. Cyphers*, 553 F.2d 1064, 1068–69 (7th Cir.), cert. denied, 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107 (1977); *United States v. Figurski*, 545 F.2d 389, 391–92 (4th Cir.1976). The opinions in these cases do not discuss 18 U.S.C. § 3500, but approve a procedure under which the trial court first examines the report in camera to determine whether it contains any exculpatory or impeachment material.

■ Thus, *Charmer* requires that when a co-defendant requests the presentence report of an accomplice witness, the district court should examine the report in camera to determine if there are any statements made by the witness that contain exculpatory or impeachment material. If there is any such material, the judge should not release it unless there is "a compelling need for disclosure to meet the ends of justice." Indeed, in *Charmer*, we reversed a district court's decision approving release of the presentence report because the information in it was available elsewhere. *Charmer*, as already indicated, was a civil case and the nature of "compelling need" would, of course, differ in a criminal case. The opinion in *Charmer*, however, did quote with apparent approval the test stated in *United States v. Cyphers* (a case like this one), which provides that the court must decide "that the report is 'absolutely essential to effective presentation of a de-

fense.'" *Charmer*, 711 F.2d at 1174 (quoting *Cyphers*, 553 F.2d at 1069). Presumably, exculpatory material would usually meet that test unless the defendant already possessed the information.

■ Salami contends that the *Charmer* test does not apply to him because he is not a "third person" in relation to Momodu and Moore, with whom he was indicted for involvement in a single conspiracy. The argument is without merit. In addition, Salami argues that whenever a codefendant requests the presentence report of an accomplice witness, the ends of justice have been met, because even "a slight variation" between trial testimony and the statements of the witness contained in the presentence report will be crucial to the defense. We doubt that such a "slight" variation could ever be a "compelling need" sufficient to overcome the interest in retaining the confidentiality of a presentence report.

■ Applying the standard set forth in *Charmer*, we have independently reviewed the presentence reports of Momodu and Moore, which have been furnished to us under seal. We agree that the reports contained no exculpatory material at all or impeachment material for which Salami could reasonably be said to have had a "compelling need." Certainly, the district court did not abuse its discretion in refusing to disclose the reports to Salami.

B. Salami's remaining contentions

■ We address Salami's remaining contentions only briefly. Salami argues that the government failed to prove that he imported over one kilogram of heroin because the suitcase he transported contained only one-half kilogram of heroin. He maintains that his actions were wholly separate from and not part of the same conspiracy as those of Momodu, who transported one and one-half kilograms of heroin, and therefore there was insufficient evidence to support Salami's conspiracy conviction. In examining whether there was sufficient evidence to support the jury's finding that Salami was part of a single conspiracy, we must determine "whether it could reasonably be inferred that [Salami] participated

in the alleged enterprise with a consciousness of its general nature and intent." *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir.1980). In addition, "[t]here is no requirement that each member of a conspiracy conspire directly with every other member of it ... or be aware of all acts committed in furtherance of the conspiracy...." *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir.1989) (citations omitted). Here, the government presented evidence that: Salami and Momodu were both recruited by Rita and were both responsible to Okorie; on the flight to Nigeria, Salami and Momodu discussed their plans to transport heroin into the United States; Salami and Momodu went together to meet Okorie; and Salami went with Moore to meet Momodu at the airport. Thus, the evidence was sufficient to support the jury's finding that Salami and Momodu were members of a single conspiracy.

■ Salami also claims that the trial court's numerous interruptions during defense counsel's examination of witnesses and the court's questions during the government's examination of witnesses deprived Salami of a fair trial. He argues that the court's questions and comments were so numerous as to effectively remove from the jury a major part of its role as a fact-finder and conveyed to the jury the court's low opinion of the defense. We must review a judge's comments upon an examination of the entire record in order to determine whether a defendant received a fair trial. See *United States v. Bejasa*, 904 F.2d 137, 141 (2d Cir.), cert. denied, —— U.S. ——, 111 S.Ct. 299, 112 L.Ed.2d 252 (1990). Although we recognize that there may be trials during which a court plays such an overly intrusive role that reversal is required, see, e.g., *United States v. Mazzilli*, 848 F.2d 384, 388 (2d Cir.1988), we do not believe that the court's actions here rose to that level. While greater restraint in comments and questions on the part of the district judge would have been wiser, based upon an examination of the entire record we find that Salami was accorded a fair trial.

We have considered all of Salami's arguments and find them without merit. For the reasons set forth above, we affirm the judgment of conviction.