**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Damaso VASQUEZ, a/k/a Tiny, Julio Abreu, a/k/a Blackie, Carlos Arroyo, and Hardy Rivera, a/k/a Billy, a/k/a Ariel Rivera, Defendants–Appellants.**

Nos. 90–2743, 90–2748, 90–2870 and 90–2970.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 15, 1991.

June 25, 1992.

Patrick Hansen, Andrew B. Baker, Jr., Diane L. Berkowitz (argued), Asst. U.S. Attys., Dyer, Ind., for U.S.

Robert W. Lewis (argued), Gary, Ind., for Damaso Vasquez.

David W. Gleicher (argued), Chicago, Ill., Alexander M. Salerno, Stevenson & Salerno, Palos Heights, Ill., for Julio Abreu.

James E. Foster (argued), Funk & Foster, Hammond, Ind., for Carlos Arroyo.

David S. Mejia (argued), Oak Park, Ill., for Hardy Rivera.

Before BAUER, Chief Judge, POSNER and FLAUM, Circuit Judges.

BAUER, Chief Judge.

A heroin distribution organization known as the "Balloon People" began in 1982 when defendants-appellants Hardy Rivera and Carlos Arroyo began selling the narcotic in small fifteen-dollar packages in the Chicago, Illinois area. Rivera purchased the heroin in bulk and then repackaged it for distribution on the street. The organization received its rather peculiar moniker because the small packages of heroin were placed inside multi-colored balloons for street distribution. Evidently, the organization used balloons for packaging primarily because, if the police raided the organization, the dealers could swallow the balloons and thereby both conceal and preserve the heroin.

From 1983 to 1984, the sales of Rivera's heroin increased and the operation expanded into northwest Indiana. This expansion in territory required a parallel expansion in Rivera's workforce. Rivera continued to hire additional distributors as the sales volume grew. Throughout this period, Arroyo, a heroin user, functioned as one of Rivera's chief street dealers.

Sometime in 1984, Rivera upgraded the relatively simple street dealing operation into a sophisticated telephone distribution system. The potential purchaser now made initial contact with the operation by calling a Chicago telephone number. The caller was screened by name and a code number. If the caller passed the examination, he received an address in either Chicago or northwest Indiana where the operation was selling heroin that day. Rivera collected the money from drug sales and supervised the organization. Arroyo and others handled the incoming calls and made any necessary deliveries. Each balloon sold for fifteen dollars; the organization sold approximately 350 balloons each day.

Rivera stored the heroin he purchased in the homes of addicts. In exchange for the use of their homes, the host addicts received free packets of heroin. In this way, Rivera could employ several different storage sites, known as "drug houses," for his heroin so that he might escape detection by police. On occasion, defendants-appellants Julio Abreu and Damaso Vasquez permitted their homes to be used as bases for the heroin distribution.

In 1987, Vasquez began supervising the Indiana portion of Rivera's heroin operation. Vasquez recruited as helpers his fiancee and his teenage nephew, who was under eighteen years of age at the time. At about the same time, the organization grew more sophisticated to satisfy increasing demand. The "Balloon People" established a second telephone line for purchasers (a second heroin "hotline" so to speak), and even installed call-forwarding so that no potential sales would be missed. In addition, the organization introduced cocaine into its sale and distribution scheme. Vasquez, for instance, sold both wholesale and retail quantities of cocaine to customers, while Abreu took telephone orders for cocaine and assisted in the distribution.

On September 20, 1989, a federal grand jury returned a fourteen-count indictment that charged Vasquez, Abreu, Arroyo, and Rivera (collectively, the appellants) with conspiracy to distribute in excess of one kilogram of heroin and five kilograms of cocaine in violation of 21 U.S.C. § 846. The government alleged that this conspiracy began in 1982 and continued through September 1989. Vasquez and Abreu also

were charged with distributing cocaine in violation of 21 U.S.C. § 841(a)(1). The appellants originally pleaded not guilty to all charges contained in the indictment.

Nevertheless, on March 27, 1990, each appellant entered into a plea agreement wherein the government agreed to dismiss the indictment in return for the appellants' guilty pleas to superseding informations. These superseding one-count informations only charged the appellants with conspiracy to distribute heroin, and shortened the conspiracy to October 1987. By pleading to the abbreviated conspiracy, the appellants sought to avoid the implications of the United States Sentencing Guidelines, which became effective November 1, 1987.

On August 2, 1990, the district court sentenced Arroyo, Vasquez, and Abreu to prison terms lasting twenty years, forty-five years, and thirty years, respectively. 747 F.Supp. 493. Three weeks later, the court sentenced Rivera to a term of sixty-five years. From these sentences, the appellants now bring this appeal.

At the outset of our analysis, we note our standard of review. In *United States v. Fleming*, 671 F.2d 1002 (7th Cir.1982), we held that

> [a] reviewing may not change or reduce a sentence imposed within the applicable statutory limits on the ground that the sentence was too severe unless the trial court relied on improper or unreliable information in exercising its discretion or failed to exercise any discretion at all in imposing the sentence.

*Id.* at 1003 (quoting *United States v. Main*, 598 F.2d 1086, 1094 (7th Cir.), *cert. denied*, 444 U.S. 943, 100 S.Ct. 301, 62 L.Ed.2d 311 (1979)). *See also United States v. Johnson*, 903 F.2d 1084, 1089 (7th Cir.1990) (collecting cases). Thus, our task is to apply the *Fleming* criteria to the facts of this case.

There is no dispute that the sentences imposed by the district court fall within statutory limits. 21 U.S.C. § 846 reads, "Any person who attempts or conspires to commit any offense defined in this chapter shall be subject to the same penalties as those prescribed for the offense, the com-

mission of which was the object of the attempt or conspiracy." The relevant statutory penalty for the underlying offense, the distribution of heroin, permits the court to impose a term of incarceration that can extend to life imprisonment, as well as fines ranging in the millions of dollars. *See* 21 U.S.C. § 841(b)(1)(A). Indeed, the plea agreements signed by each appellant made clear that the sentence imposed could stretch to life imprisonment. Each plea agreement contained the following sentence: "I understand that under the terms of this plea agreement I can receive a sentence ranging from probation to life imprisonment."

▮ With the statutory limits clear, we must focus our inquiry upon the district court's exercise of its discretion. As *Fleming* instructs, the burden borne by the appellants on appeal is heavy. In order to prevail, the appellants must establish that the court relied on improper or unreliable information in exercising its discretion or that the court simply failed to exercise its discretion at all. The appellants' burden is made even heavier by the fact that sentencing courts have broad discretion to determine what sentences to impose. *Johnson*, 903 F.2d at 1089 (citing *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972)). For instance, the sentencing court determines what weight to give the factors in each case such as the nature of the offense, the potential for deterrence through punishment, and the demeanor of the defendant. *See United States v. Sato*, 814 F.2d 449, 452 (7th Cir.1987), *cert. denied*, 484 U.S. 928, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987); *United States v. Marquardt*, 786 F.2d 771, 781 (7th Cir.1986). Moreover, the sentencing court may rely on information that would not be admissible at trial. *Johnson*, 903 F.2d at 1089. 18 U.S.C. § 3661 states: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

■ In the instant case, the district court did not rely on improbable or unreliable information. Nor did the court fail to exercise its discretion. Consider the sixty-five year sentence imposed upon appellant Rivera. Rivera claims that the district court, in determining his sentence, failed to consider his age (thirty-seven at the time of sentencing), his lack of an extensive criminal history, his family obligations, his rehabilitation potential, and the assets he voluntarily forfeited to the government. *See* Rivera's Brief at 11. Rivera is mistaken. The district court considered each of these factors, as well as several others. At the sentencing hearing, the district court stated:

I have in this particular case completely reviewed the presentence report, and of course, the memorandum that were filed by your attorney, and also these letters from your wife, your son, other relatives, friends who love and care for you.... I have taken into account, among other things, the nature of the crime to which you have pled guilty, the time that this conspiracy existed, the amount of drugs involved, your role in the offenses, and that this offense, Mr. Rivera, was committed by you for profit and not because you were a victim of crime.... I have considered the letters from your family and friends and the impact on your family, and I have considered the hope of rehabilitation for yourself and hopefully some day returning you to society as an asset. Mr. Rivera, I have also considered my duty to society and my sworn duty to enforce the law set down by our Congress and to give just and fair punishment. I have also considered your plea agreement and your voluntarily turning over and forfeiting a significant amount of assets, what advantages and detriments you receive by the plea agreement. I have considered the nature of your crime and its effect on society. Finally, I have considered a sentence which might act as a deterrent, and hopefully send a message to society that this court will not act lightly on this type of crime, and if one chooses to deal in drugs, he'll have to pay the price.

*See* Transcript of Proceedings, Rivera Sentencing, August 24, 1990 ("R.Trans.") at 86–90.

This lengthy excerpt demonstrates that the district court considered the factors that Rivera claims should have justified greater leniency. In essence, Rivera's claims of error challenge the *weight* given each factor by the district court. Indeed, the record suggests that, though the district court considered Rivera's family obligations, rehabilitation potential, etc., it was more impressed by the sophistication of Rivera's operation, the adverse impact that that operation had on society, and the deterrent effect Rivera's sentence might have on those contemplating a similar course of conduct. As it sentenced Rivera to a lengthy term of incarceration, the district court declared, "I don't take pleasure in taking people away from family.... It saddens me very much to read [the] letters. [W]hat reason is there for this defendant's family to be under the stress that they now find themselves in? Who caused it? How many lives have been ruined? How many young lives, how many families? How many people have had their careers or opportunities for careers ruined by people such as yourself who wanted to profit from this misery?"

Given the district court's thorough analysis of the factors supporting Rivera's sentence, we cannot say that the district court's decision was devoid of the type of thoughtful consideration required to ensure an appropriate penalty designed to fit both the crime and the criminal. *See United States v. Neyens*, 831 F.2d 156, 159 (7th Cir.1987). As we declared in *Neyens* and its progeny, "as long as it appears that the sentencing judge is aware of the mitigating factors, and that he has considered them in good faith, the degree of weight put on those factors will seldom be questioned." *Id.* at 160.

■ Rivera raises an additional claim that deserves discussion. He argues that the district court impermissibly considered his own nationality when sentencing the appellant. *See* Rivera's Reply Brief at 5 ("The sentencing judge's response ... was

an abuse of discretion by factoring the judge's and the defendant's same nationality into the sentence he gave Rivera.''). This argument amounts to a complete misreading of the record. The district court did not consider the defendant's nationality or his own in determining the appropriate penalty. It was Rivera's counsel who cited the appellant's nationality as a mitigating factor. Counsel argued:

> Your Honor, just to assess the crime itself, just the offense itself, this is—I mean let's say it exactly for what it is, these are low-level punk street dealers of small quantities of low-level purity heroin.... [T]hese are the poor people, the unsophisticated, the uneducated, the people without advantages, the people without money, the people without position, the people without—and I can say this as a Latino attorney, a person without background to have all the advantages of life that do what they are taught is the only way on the street to make money.

R.Trans. at 74.

The district court flatly rejected counsel's argument. When discussing Rivera's entry into the illegal drug business, the district court stated:

> [Counsel], I take exception to one comment ... but when you spoke that the defendant was Latino, with little education and background, that does not justify what occurred here. I am Latino and I am very proud of it myself. I know of thousands of Latinos who are poor and are proud and work hard to make an honest living. They don't try to defy the law. That isn't only true for

Latinos, it's true for Blacks, Caucasians, every race in the world. So I can't accept that.

*Id.* at 87–88. These excerpts from the record demonstrate that race or nationality played no role in the district court's determination. Thus, appellant's claim that the district court impermissibly considered its own nationality in sentencing is wholly without merit.[1]

▇ Like the district court, we too are saddened by the long years of separation Rivera's sentence imposes on the appellant and his family. We recognize with neither pride nor satisfaction that, as federal judges reviewing criminal penalties, it is our duty to wield the most awesome power given to government other than the power to declare war: the power to take away a person's life—or at least some part of it. The district court, in the legitimate exercise of its discretion, has determined that Hardy Rivera should serve a term of sixty-five years. We find no error in that determination.[2]

The remaining three appellants, Vasquez, Abreu, and Arroyo, who received terms of forty-five years, thirty years, and twenty years, respectively, raise similar claims. Vasquez, for instance, argues that the district court considered the government's representations regarding his lack of cooperation and then used that information as a key determinant in its sentencing decision. *See* Vasquez Brief at 10. Yet Vasquez can find no support in the record for his claim. He merely asserts that, because the prosecutor stressed the limited

---

1. Equally without merit is the argument that had the district court applied the Sentencing Guidelines, which became effective in November 1987, Rivera would have received a far shorter term of incarceration. *See* Rivera's Brief at 9–10. The government suggests the opposite: if the Guidelines applied, Rivera would have received a longer sentence, namely life imprisonment. *See* Government's Brief at 18. We see no need to resolve irrelevant disputes, especially when the district court had no reason to make the particular factual findings necessary for Guidelines' calculus. Rivera and his co-appellants pleaded guilty to a conspiracy that specifically ended in October 1987. The focus of this dispute, then, is not what sentence the Guidelines may have generated, but whether

the district court abused its discretion in sentencing the appellants for their pre-Guidelines crimes.

2. We think it important to note that under applicable statutes, a person serving a sentence of thirty years or more becomes eligible for release on parole after serving ten years. *See* 18 U.S.C. § 4205. Moreover, 18 U.S.C. § 4206 states that, with certain exceptions, a prisoner must be released on parole after serving two-thirds of each consecutive term or terms of more than forty-five years. Had the defendants been sentenced under the Guidelines, parole would not have been available. *See* 18 U.S.C. § 3624.

nature of the appellant's cooperation and thereby contradicted the findings of the presentence report,[3] the district court must have relied on that information in order to arrive at the severe forty-five year penalty.

■ Vasquez contends that the government's contradiction of the presentence investigation report amounted to a denial of due process. He is mistaken. Due process guarantees a fair sentencing hearing, which is precisely what the appellant received. The district court gave Vasquez, through his counsel, the chance to rebut the prosecutor's comments. The appellant's counsel seized that opportunity and underscored the presentence report's finding that Vasquez had cooperated with the government. *See* V. Trans. at 25.

■ This exchange demonstrates that there was no denial of due process. As we repeatedly have declared, the major purpose of a sentencing hearing is to allow the court an opportunity to determine what information is or is not sufficiently reliable to consider in reaching a sentencing decision. *United States v. Agyemang,* 876 F.2d 1264, 1271 (7th Cir.1989). Thus, a sentencing hearing satisfies due process if it is adequate to allow the district court to exercise its discretion in an enlightened manner. *Id.* (quoting *United States v. Satterfield,* 743 F.2d 827, 840 (11th Cir.1984), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985)). During Vasquez's hearing, the district court was able to consider the full impact of the presentence report as well as any additional evidence presented by each side. Vasquez's contention that he was denied due process is without merit.

■ Abreu also claims that the district court improperly considered certain information presented by the government. Specifically, Abreu contends that the district court failed to give sufficient deference to a presentence report that ranked him as a

low-level functionary in the drug distribution scheme. *See* Abreu Brief at 11–12. This appellant also argues that the court ignored the presentence report's statements concerning his use of cocaine and, as a result, neglected to consider his drug habit as a mitigating factor. *See id.* at 12.

We are not persuaded. As we have stated, it is the duty of the sentencing court, not the defendant, to determine what weight a given piece of evidence or testimony will have in calculating a sentence. *Marquardt,* 786 F.2d at 781. In sentencing Abreu, the district court chose not to accept the appellant's representations that were repeated in the presentence report. Instead, the district court concluded that Abreu was not a significant drug user; his participation in the drug-selling scheme was motivated by simple greed, not physical necessity. During the sentencing hearing, the court stated:

> This Court has reviewed the presentence report very carefully and has listened to both counsel.... In regards to your case, Mr. Abreu, it is much disturbing to me that you were involved in this for a profit, for greed, put it; that you are not a user of drugs yourself. I guess in a way, thank God, you're not. I don't want you to be a user of drugs. But at least those individuals have some excuse why they have to do it. You didn't. You come from a good upbringing family and there is no reason to go into this. I have to make a determination as to what to do insofar as your sentence is concerned. I'm concerned with hopefully some day bringing you back to society as an asset, as an asset not only to society, but to these children that you brought into the world.

Transcript of Proceedings, Abreu Sentencing Hearing, August 2, 1990 ("A. Trans.") at 82–84. With the thoughtful consideration demonstrated in this excerpt, the dis-

---

**3.** The record demonstrates that the prosecutor at the beginning of the Vasquez's sentencing hearing accepted without amendment the presentence investigation report. Then, after Vasquez's counsel emphasized that his client had cooperated with the government, a fact supported by the presentence report, the prosecutor sought to undermine the value and sincerity of Vasquez's cooperation. *See* Transcript of Proceedings, Vasquez Sentencing Hearing, August 2, 1990 ("V.Trans.") at 8, 19.

trict court did not abuse its discretion in sentencing Abreu.

We note that Abreu also argues, as does appellant Hardy Rivera, that the sentences imposed by the district court constitute a violation of the Eighth Amendment's ban on cruel and unusual punishment. They cite *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), where the Supreme Court held that the imposition of life imprisonment without the possibility of parole for a seventh nonviolent felony (passing a $100 no-account check) violated the Eighth Amendment. Like the defendant in *Solem*, both Abreu and Rivera contend that the sheer length of their sentences, thirty years for Abreu and sixty-five years for Rivera, bears no reasonable relationship to the severity of their crimes. These appellants support their claims of cruel and unusual punishment by comparing their sentences to those of other defendants convicted of similar crimes.

While *Solem* recommends comparing sentences both within and across jurisdictions to determine the appropriateness of a given penalty, we need not engage in *Solem*-type analysis. We previously have determined that in non-capital felony convictions, a particular offense that falls within legislatively prescribed limits will not be considered disproportionate unless the sentencing judge has abused his discretion. *See United States v. Mitchell*, 788 F.2d 1232, 1237 (7th Cir.1986) ("[A]s [the appellant's] sentence was within the maximum provided by Congress, it is only subject to review on appeal for a manifest abuse of discretion."). *See also Williams v. United States*, 805 F.2d 1301, 1308 n. 8 (7th Cir.1986), *cert. denied*, 481 U.S. 1039, 107 S.Ct. 1978, 95 L.Ed.2d 818 (1987). Because there is no dispute that both Abreu's and Rivera's sentences fall within legislatively prescribed limits, and because, as we already have determined, the district court did not abuse its discretion when sentencing Abreu and Rivera, we see no violation of the Eighth Amendment. *See also Harmelin v. Michigan*, — U.S. —, —, 111 S.Ct. 2680, 2701, 115 L.Ed.2d 836 (1991) (imposition of mandatory sentence of life in prison without possibility of parole for first-time felony offense of possessing 672 grams of cocaine did not constitute cruel and unusual punishment).

Lastly, we consider the claims of appellant Carlos Arroyo. Arroyo first argues that his Sixth Amendment right to the counsel of his choice was violated when the district court disqualified his original attorney due to the court's finding of a potential conflict of interest. *See* Transcript of Proceedings, Hearing on Petition to Enter Change of Plea, March 27, 1990 ("Ar.Trans.") at 407–08. Arroyo asserts that there was no showing of "serious potential" for conflicting interests necessary to justify the district court's decision to disqualify. *See* Arroyo Brief at 13. Arroyo argues, "The court's holding that [the appellant] was not capable of a knowing and intelligent waiver in the absence of an articulated conflict is, respectfully, paternalistic to the point of destroying the right to choose counsel of one's choice." *Id.*

Although every defendant has the right to retain an attorney of his choice, that right is not absolute. A court is obligated to balance the right to counsel of choice with the broader interests of judicial integrity. Settled law requires the court to take action to protect the defendant's right to effective assistance of counsel unless, after inquiry, the court believes that a conflict of interest is unlikely to arise. In *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the Supreme Court stated:

> While permitting a single attorney to represent codefendants ... is not per se violative of constitutional guarantees of effective assistance of counsel, a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel.... For these reasons we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

*Id.* at 159–60, 163, 108 S.Ct. at 1697–98, 1699.

In the instant case, the district court determined that Arroyo's waiver was neither knowing nor intelligent. *See* Ar. Trans. at 408. The court's conclusion is amply supported by the record. Even Arroyo's chosen counsel agreed that it "might be best" not to represent Arroyo when his associated attorneys were representing Arroyo's codefendants. Thus, we see nothing to suggest that the district court violated the Sixth Amendment when it disqualified the appellant's retained counsel.

Arroyo also maintains that the district court abused its discretion in sentencing him to a twenty-year term of incarceration. Arroyo claims that he was nothing more than a low-level employee of the drug-dealing organization. As a consequence, Arroyo contends, he should not have received a sentence any more severe than the sentences the other low-level street dealers received. The appellant neglects to mention he was with Rivera from the very inception of the conspiracy and that he was one of the organization's chief street dealers of heroin. *See* Transcript of Proceeding, Arroyo Sentencing Hearing, August 2, 1990, at 622.

We see no reason to reiterate the broad discretion the district court possesses when sentencing. As we have seen, an appellate court will not disturb a sentence unless it exceeds statutory limits or the sentencing judge relied on improper information in exercising his discretion. Appellate review of sentencing is, therefore, extremely narrow. *United States v. Dougherty,* 895 F.2d 399, 405 (7th Cir.1990). In the instant appeal, the record reflects that Arroyo's sentence was based upon the serious nature of the offense and the relevant background of the appellant. The district court took all available evidence into consideration in order to arrive at its decision. Thus, there was no abuse of discretion.

For the foregoing reasons, we affirm the sentences of Hardy Rivera, Damaso Vasquez, Julio Abreu, and Carlos Arroyo.