UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph M. COLELLO and Sandra
Colello, Defendants–
Appellants.

Nos. 93–1318, 93–1319.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1993.

Decided Feb. 8, 1994.

Jacqueline O. Stern, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Crim. Div. and Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

William Hedrick (argued), O'Keefe, Lewis & Bruno, Skokie, IL, for defendants-appellants.

Before ESCHBACH, FLAUM and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Joseph and Sandra Colello pled guilty to mail fraud charges arising from a scheme in which the Colellos and their co-defendants staged automobile accidents and other incidents and then collected on fraudulent insurance claims. Pursuant to the Sentencing Guidelines, Joseph was ordered to serve 42 months in prison and to pay $200,000 in restitution; Sandra, who pled guilty to conduct that pre-dated the Guidelines, was ordered to serve 6 months in prison and 6 months in a work release program and to pay $5,190 in restitution. The Colellos appeal their sentences, contending that they are excessive in relation to the punishments meted out to their co-defendants. We affirm.

## I. BACKGROUND

From 1982 through 1989, Joseph and Sandra Colello participated in a scheme to defraud insurance companies through the submission of false or inflated insurance claims for personal injuries, lost wages, and property damage. These claims were based on a variety of incidents, including automobile collisions and fires, slip-and-fall injuries, thefts, and burglaries. In some instances, the incidents actually occurred; but in many cases, the mishaps themselves were either staged or completely fictional. Following these events, the participants in the scheme would create false documentation to support their insurance claims, including bills for emergency and follow-up medical treatment, ambulance service, prescriptions, automobile towing and rentals; repair estimates; and wage loss verifications. The defendants typically used aliases, false Social Security numbers and forged identifications to purchase insurance policies and make the fraudulent claims. Over the life of the scheme, the defendants defrauded more than twenty insurance companies of some $660,000.

## II. ANALYSIS

Joseph Colello contends that his right to due process was violated when his sentence was enhanced for playing a leadership role in the conspiracy, for obstruction of justice, and for a monetary loss greater than his individual profit from the scheme. As a result of these enhancements, Mr. Colello argues, his sentence is excessive in comparison to those of similarly situated co-defendants. Sandra Colello also argues that her sentence is unduly harsh, suggesting that it may violate the Eighth Amendment proscription of cruel and unusual punishment. She emphasizes that her role in the scheme was limited, that she had no prior criminal history, a limited education, and was the mother of two children, and that others who, in her view, played a more substantial role in the scheme received lesser punishments.

At the outset, we must reiterate that we cannot disturb a sentence based solely on the ground that another defendant was sentenced differently. *United States v. Edwards*, 945 F.2d 1387, 1397–98 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992); *see also United States v. Cea*, 914 F.2d 881, 889 (7th Cir. 1990), *cert. denied*, —— U.S. ——, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992); *United States v. Smith*, 897 F.2d 909, 911 (7th Cir.1990) (per curiam); *United States v. Guerrero*, 894 F.2d 261, 267–68 (7th Cir.1990). As we explained

in *United States v. Salazar*, 983 F.2d 778, 783 (7th Cir.1993), an appellant "cannot ultimately complain (either under equal protection doctrine or any other legally cognizable principles) because [his co-defendant] may have been treated more leniently than *he* should have been—so long, that is, as [the appellant] himself was sentenced in accordance with the Guidelines." (Emphasis in original.) This is true even when the appellant was sentenced under pre-Guidelines principles, as Mrs. Colello was, so long as the sentence reflects a proper exercise of the court's broad discretion. *See Guerrero*, 894 F.2d at 267 (collecting cases); *see also United States v. Morris*, 957 F.2d 1391, 1403 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 380, 121 L.Ed.2d 290 (1992); *Smith*, 897 F.2d at 911. Our task is to ensure that the district court did not commit legal error, misapply the Sentencing Guidelines, rely on a clearly erroneous finding of fact, or in some other way manifestly abuse its discretion. *See Cea*, 914 F.2d at 889; *Guerrero*, 894 F.2d at 267–68. Thus, insofar as the Colellos challenge their sentences on the ground that they are excessive in relation to the sentences that their co-defendants received, we cannot entertain their arguments. Instead, our review is limited solely to their contention that their sentences, standing alone, were improperly calculated.

**A. Joseph Colello**

■■■ We turn first to the four-level enhancement that Joseph Colello received as an organizer of the scheme. The Guidelines require this increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." United States Sentencing Commission, *Guidelines Manual*, § 3B1.1(a) (Nov. 1992). The district court's determination that a defendant was an orga-

nizer or leader is a factual finding that we may reverse only if it is clearly erroneous. *United States v. Miller*, 962 F.2d 739, 745 (7th Cir.1992) (citing *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989)).[1]

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G., § 3B1.1, comment. (n. 3).

Having reviewed the record in light of these factors, we discern no error in the district court's conclusion that Mr. Colello was an organizer or leader of this scheme. Of the more than sixty claims listed in the government's summary of the scheme (R. 107, Gov. Ex. "Summary Chart"), the accuracy of which Mr. Colello has largely conceded (*see* R. 106 at 5), Mr. Colello was involved in forty-eight. There is also substantial evidence indicating that he (1) recruited (among other scheme participants) Dr. Lawrence Levin, a chiropractor who typically signed off on the fraudulent medical documentation for personal injury claims, and Sigmund Bilski, a fellow employee of the Chicago Streets and Sanitation Department, who deliberately crashed his garbage truck into selected automobiles at Mr. Colello's direction; (2) supplied the bulk of the documentation submitted in support of insurance claims, including medical bills and wage loss verification forms;[2] (3) physically arranged and participated in many of the staged automobile accidents and visited emergency rooms after they were completed in order to supply a basis for phony medical expenses; (4) direct-

1. A finding is clearly erroneous "when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. Sykes*, 7 F.3d 1331, 1335 (7th Cir.1993) (internal quotation marks and citations omitted).

2. Charles Jedrzejas, among others, testified that Mr. Colello usually supplied the false documentation. Jedrzejas Tr. 5. In addition, the govern-

ment submitted to a handwriting expert more than 200 documents that the insurance companies had received in connection with the fraudulent claims. The expert concluded that of these documents, sixty-five contained handwriting that was Mr. Colello's; fifty-five contained handwriting that was "probably" his; and another eighty-five contained handwriting that was "possibly" his. R. 107, Gov. Ex. "Handwriting Report."

ed fellow participants as to what they should say about the accidents; (5) supplied the cars and title documents required for staged accidents and thefts; (6) supplied money to other participants to purchase insurance policies; (7) hired attorneys to handle certain fraudulent claims; (8) distributed insurance proceeds to fellow participants; (9) arranged for estimates on damaged vehicles; (10) filed false personal injury claims for genuine automobile accidents in which he had not been involved; and (11) used the radio in the truck he drove as a Streets and Sanitation worker to report a "found" vehicle whose theft had been staged. A number of the participants in the scheme also testified before the grand jury[3] that when they received payment on their claims from the insurance companies, they would pay a share of the proceeds (typically one-half) to Mr. Colello. Indeed, his own profit from the scheme—some $266,-000—was substantial. Although, as Mr. Colello contends, his efforts in furtherance of the scheme were not in all cases unique, this does not detract from the inescapable inference that amongst all of the participants, he was the most responsible for the affairs of the scheme.

Finally, we find it quite telling that in the Spring of 1989, when the scheme participants became aware that they were under investigation, Mr. Colello directed the others to tell the authorities that a mythical "Diane"— purportedly the wife or girlfriend of scheme participant Charles Jedrzejas—had been the person who orchestrated the scheme.[4] According to Jedrzejas, he and Colello had agreed that Jedrzejas would initially accept responsibility for the scheme and then point the finger at "Diane"; in return, Colello had promised to "take care of [him] financially." Jedrzejas Tr. 21–22. The natural inference from this evidence is that Colello was attempting to hide his own role as the ringlead-

er of the scheme, and that is exactly what scheme participants William Bascom and Donna Bilski testified. W. Bascom Tr. 15–16; D. Bilski Tr. 11. Under these circumstances, the district court's decision to apply the organizer enhancement was quite sound.

 The two-level enhancement for obstruction of justice pursuant to Guidelines section 3C1.1 was also amply justified by the evidence. Indeed, Colello's contention is not that he did not merit the enhancement, but that other defendants should have received it for the comparable lies they told to the authorities investigating the scheme. Yet, as we have explained, it is not our province to examine the sentences of Mr. Colello's codefendants. *See* cases cited at pages 194–95, *supra.* We are confined to his sentence alone, and in that context we find no clear error in application of the enhancement. *See United States v. Carson,* 9 F.3d 576, 583 (7th Cir.1993); *United States v. Pitz,* 2 F.3d 723, 730 (7th Cir.1993) (obstruction enhancement reviewed for clear error). Mr. Colello himself told a number of material lies to government investigators, insisting that none of the accidents underlying the fraudulent insurance claims had been staged and embellishing the "Diane" tale with a physical description and some of the false identifications she had purportedly used. *See* R. 98 at 6–7; R. 107 Gov. Ex. "Agent's Notes." Witness after witness informed the grand jury that Colello had instructed his accomplices to likewise place the blame for their scheme on the fabled "Diane" and to deny that any of the accidents had been staged. *See, e.g.,* W. Bascom Tr. 15–16; Jedrzejas Tr. 21–22; J. Bilski Tr. 32–33; Steve Bilski Tr. 21; D. Bilski Tr. 11. Indeed, Mr. Colello went so far as to prepare a written script for Charles Jedrzejas to use during electronically monitored telephone calls that Colello would later

---

3. Grand jury testimony is an appropriate source of information for the sentencing court to consider, so long as the court is satisfied that the testimony is reliable. *United States v. Campbell,* 985 F.2d 341, 348 (7th Cir.1993). Although Mr. Colello voiced a passing complaint below regarding the government's reliance on the grand jury testimony of other participants in the scheme (R. 98 at 1; R. 106 at 1), he does not renew that objection here. In any event, we find nothing in his objections below that would call the reliabili-

ty of any individual's grand jury testimony into question; indeed, he relied on the same testimony in support of his objections to the proposed sentencing enhancements (R. 106 at 3–6).

4. Among other things, the fictitious Diane was supposed to have supplied the bogus documentation for the fraudulent insurance claims, a task that was routinely handled by Mr. Colello.

place to him purportedly in "aid" of the government's investigation. R. 107 Gov. Ex. "Script"; Jedrzejas Tr. 21–22. These transparent efforts to downplay the gravity of the scheme and to deflect responsibility away from himself rendered the obstruction enhancement singularly appropriate in Mr. Colello's case. The fact that Mr. Colello's campaign of deception ultimately failed is immaterial; "[s]ection 3C1.1 provides an increase for *attempts* to obstruct justice as well as actual obstruction of justice." *United States v. Gaddy,* 909 F.2d 196, 199 (7th Cir.1990) (emphasis in original); *see also United States v. Stevenson,* 6 F.3d 1262, 1269 (7th Cir. 1993); *United States v. Caicedo,* 937 F.2d 1227, 1235 (7th Cir.1991).

■ Finally, we believe it was appropriate for the district court to calculate the loss caused by Mr. Colello's criminal conduct based on the total amount of money of which the insurance companies had been defrauded (approximately $668,000), a determination that resulted in an eight-level increase in his offense level. *See* U.S.S.G. § 2F1.1(b)(1)(I) (Oct. 1987).[5] "Although the district court's loss calculation is a factual finding that we review for clear error, the meaning of loss for purposes of section 2F1.1 is a question of law that is subject to de novo review." *United States v. Holiusa,* 13 F.3d 1043, 1045 (7th Cir.1994).

Mr. Colello himself may have only reaped $266,000 from the scheme, but the relevant loss for purposes of section 2F1.1(b) is not limited to a defendant's personal gain from the fraud. Given section 2F1.1's emphasis on the victim's loss rather than the defendant's profit, *see* Application Note 8 ("[t]he offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss"), Mr. Colello certainly may be held to account for fraudulent claims that he assisted in some way, even if he did

not share in the proceeds. Moreover, section 1B1.3(a)(1)(B) directs the sentencing court to consider, "in the case of a jointly undertaken criminal activity, ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *See Smith,* 897 F.2d at 910–11; *see also United States v. Chichy,* 1 F.3d 1501, 1510 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993); *United States v. Lorenzo,* 995 F.2d 1448, 1460 (9th Cir.), *cert. denied,* —— U.S. ——, ——, ——, 114 S.Ct. 225, 227, 589, 126 L.Ed.2d 180 (1993). Thus, the district court's decision to look beyond Mr. Colello's profit was a correct application of the law. On the factual side of the loss determination, Mr. Colello does not attempt to argue that any of the claims resulting in the total loss figure were not in furtherance of the scheme that he and his co-defendants pursued; nor does he suggest that any were not foreseeable to him. In light of his role as the leader of this scheme as well as its most active participant, it was perfectly appropriate for the district court to attribute to Mr. Colello the total loss inflicted on the insurance companies for sentencing purposes.

### B. Sandra Colello

■ We find no merit in Mrs. Colello's contention that her pre-Guidelines sentence of six months incarceration and six months work release is excessive. Although Mrs. Colello suggests that the sentence was so disproportionate to her culpability as to violate the Eighth Amendment's proscription against cruel and unusual punishment, the sentence was well short of the maximum term of ten years (five on each of the two counts to which she pled guilty), and in that context our review is limited to determining whether the district court abused its discretion by relying on improper criteria or unreliable information or failed to exercise its discretion at all. *United States v. Simpson,* 8

---

5. The probation officer and the district court employed the 1987 version of the Guidelines, which was more lenient insofar as the loss calculation was concerned because it specified an increase of eight levels rather than ten. *Cf.* U.S.S.G. § 2F1.1(b)(1)(K) (Nov. 1992). Although Congress has required sentencing courts to employ the version of the Guidelines in effect at the time of sentencing, 18 U.S.C. § 3553(a)(4), that

directive may yield to the *Ex Post Facto* Clause of the Constitution where the version in effect at the time of the offense is more favorable to the defendant, as it was here. *See United States v. Schnell,* 982 F.2d 216, 218–19 (7th Cir.1992). That is a question we need not decide, however, for the parties have acquiesced in the court's use of the 1987 guidelines. *See United States v. Harris,* 994 F.2d 412, 416 n. 9 (7th Cir.1993).

F.3d 546, 550 (7th Cir.1993); *United States v. Vasquez,* 966 F.2d 254, 261 (7th Cir.1992); *United States v. Ramusack,* 928 F.2d 780, 783 (7th Cir.1991); *United States v. Nesbitt,* 852 F.2d 1502, 1521–22 (7th Cir.1988), *cert. denied,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). As we observed in *United States v. Nowicki,* "[i]f the sentencing judge gives thoughtful consideration to the sentence she imposes, this court will not disturb the imposition of disparate sentences on co-defendants." 870 F.2d 405, 409 (7th Cir.1989) (internal quotation marks and citations omitted).

Our review of the sentencing transcript satisfies us that the district judge exercised his discretion appropriately in sentencing Mrs. Colello. Other defendants, it is true, received sentences that were more lenient than hers. But disparity among co-defendants per se is not sufficient to demonstrate an abuse of discretion, *e.g., United States v. Threw,* 861 F.2d 1046, 1049 (7th Cir.1988); rather, "consideration[ ] of the extent and nature of a defendant's role in a scheme is a sound basis for disparate sentences among co-defendants," *United States v. Neyens,* 831 F.2d 156, 159 (7th Cir.1987). Sandra Colello participated directly in a number of incidents—staging a car fire, submitting false claims for water damage and theft, scripting a fictional slip-and-fall injury in her beauty salon, and arranging to have a car driven into her backyard swimming pool. She admitted her role in many of these incidents before the grand jury. Colello Tr. 26–28; *see also* J. Bascom Tr. 51, D. Bilski Tr. 7. She also acknowledged preparing a variety of false documents to support the insurance claims, including fire and police reports, automobile rental bills, wage loss verification forms, and tax forms. Colello Tr. 22–28; *see also* W. Bascom Tr. 14, Jedrzejas Tr. 7. She even helped her husband prepare the script for Charles Jedrzejas to use in misleading the authorities. Colello Tr. 29–31. If these activities were not enough to distinguish Mrs. Colello's culpability from other participants

in the scheme, the profits she enjoyed together with her husband were. As she acknowledged before the grand jury:

> I was responsible for paying the bills and keeping track of our checking account. The checks that my husband and I received from insurance companies were generally deposited into our joint checking account. We did not keep the insurance proceeds separate from our other money. We used the money to pay bills and to purchase various things, and to run our household.

*Id.* at 28.[6] Under these circumstances, the relatively modest sentence that the district court imposed on Mrs. Colello was amply justified and certainly consonant with the Eighth Amendment.

### III. CONCLUSION

For the reasons given above, we affirm the sentences imposed on Joseph and Sandra Colello.

AFFIRMED.

---

**6.** Mrs. Colello repeatedly emphasizes that the district court ordered her to pay only $5,190 in restitution, as if that reflected her role in or profit from the scheme. Yet, as the government points out, she and her husband shared jointly in

the proceeds of the scheme, and the amount of restitution imposed on her must be viewed in conjunction with the amount imposed on her husband ($200,000), most or all of which no doubt would be satisfied from joint assets.