In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2109

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DAVID A. COMBS,

Defendant-Appellant.


Appeal from the United States District Court
for the Southern District of Illinois, Benton Division.
No. 98 CR 40044--J. Phil Gilbert, Chief Judge.


Argued November 30, 1999--Decided July 25, 2000



Before MANION, KANNE and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  David A. Combs was charged with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. sec. 841(a)(1). The district court granted a mistrial sua sponte during Combs' first trial, when the court discovered that his attorney had possibly represented the prosecution's key witness against him. With new counsel for both Combs and the witness, a second trial commenced. A jury ultimately convicted Combs, and the court sentenced him to 192 months of imprisonment. Combs appeals, contending that his second trial was held in violation of the double jeopardy clause of the Fifth Amendment, that the dismissal of his original counsel violated his Sixth Amendment right to counsel, that the court erred in granting the mistrial sua sponte, that the court erred in failing to suppress his confession, and that the government failed to produce sufficient evidence to allow a rational jury to find him guilty beyond a reasonable doubt. We affirm.

I.

On March 11, 1998, the California Airport Authority Drug Task Force intercepted a suspicious package that had been mailed by "Bill Combs" from a Mail Boxes Etc. store in California

to Shawn Temelcoff in Mount Vernon, Illinois. After obtaining a search warrant for the package, the Task Force officers discovered it contained a large quantity of methamphetamine. The Task Force contacted the Mount Vernon police department, and arranged a controlled delivery of the package to Temelcoff. Temelcoff accepted the package, and the Mount Vernon police then executed an anticipatory search warrant on her home. They found the package unopened in Temelcoff's bedroom. The officers interviewed Temelcoff and learned that she did not know what was in the package, but that it had been mailed to her by David Combs. She was involved in a romantic relationship with Combs, who had called her recently to tell her that a package was on the way. Combs asked that she hold the package until he arrived, and directed her not to open it. Temelcoff and Combs met regularly on the night of the full moon, and Combs told Temelcoff he would be arriving on the evening of the next full moon to pick up the package. Temelcoff relayed all of this to the police, who arranged to be present for Combs' next moonlit visit.

On the evening of March 12, 1998, officers hidden in Temelcoff's home heard Combs arrive and ask Temelcoff for the package. Combs told Temelcoff he had been worried sick about sending it. As he left Temelcoff's home with the package in his hands, Combs was arrested by federal drug enforcement officers. He was transported to the Mount Vernon Police Department where, prior to questioning him, Officers Randall Nodolski read Combs his rights, using a Miranda waiver form. When Officer Nodolski informed Combs that anything he said could be used against him, Combs replied that if the officers wanted to use his statement against him, Combs might need a lawyer. In response to this equivocal statement, Officer Nodolski again read the form to Combs and asked him if he understood his rights. Combs indicated that he understood his rights and wanted to speak to the officers "off the record." Thereafter he made an incriminating statement to the officers regarding his involvement with the package containing methamphetamine. As he made the statement, one of the officers took notes of everything Combs said. At no point in the interrogation did Combs explicitly ask for an attorney. At no point did the officers agree that the statement would be off the record.

Combs' first trial commenced on September 28, 1998. On the first morning of trial, after the first two government witnesses testified, the court learned from the government that Combs' attorney, James Proffitt, had involved himself in the defense of Shawn Temelcoff, who, not surprisingly, turned out to be one of the

government's key witnesses. Temelcoff had not been charged with anything, but after Proffitt interviewed her about her potential testimony, he procured a lawyer for her. Combs' mother paid Temelcoff's legal fees, and the payments were arranged by and funneled through Proffitt. Combs' mother was paying her son's legal fees as well, and the court became concerned that the same source was paying the legal fees for both the defendant and the key witness against him. The court, on learning these facts, appointed a new attorney for Temelcoff. The next day, the court addressed Combs and Proffitt directly in open court. At that time, Proffitt admitted that he advised Temelcoff that she needed an attorney and that he offered to arrange for Combs' mother to cover the cost. He introduced an attorney, Monroe McWard, to Temelcoff, arranging a meeting at a restaurant for them. McWard subsequently sent Proffitt the retainer agreement that Temelcoff signed. Proffitt deposited a check from Combs' mother into his own business account and then wrote a check to McWard from that same account. Proffitt admitted that he knew that at some point, Combs' interests would conflict with Temelcoff's and that Temelcoff would take the witness stand. He related to the court that when he first met with Temelcoff, he told her that "she had to tell the truth no matter what." Tr. at 183. He admitted he spoke to her at the lunch break on the first day of the trial, and told her again that "she had to tell the truth. No matter what she might have wanted, no matter how they wanted things to come out, it didn't make any difference. She must tell the truth." Tr. at 183. Proffitt told the court that he believed Temelcoff was so intimidated and frightened at that point that she would say whatever she thought she had to say to save her neck. Proffitt thought under the circumstances that Temelcoff should not be permitted to testify.

Based on these admissions, the court explained to Combs the potential conflict presented by Proffitt's involvement with Temelcoff and McWard. The district court noted that a mistrial would be necessary if Combs declined to waive any conflicts. After consulting with Proffitt, Combs refused to waive the conflict, stating "I don't want to waive nothing, but I do want him to represent me," insisting that Proffitt remain his lawyer./1 Tr. at 192. The court then declared a mistrial, dismissed Proffitt as counsel for Combs, and rescheduled the trial.

Combs moved to dismiss the indictment, contending that a retrial was barred by the double jeopardy clause of the Fifth Amendment. The district court found that Proffitt involved himself in Temelcoff's legal assistance by

recommending and then procuring legal representation for her, and by arranging for payment of Temelcoff's legal fees by Combs' mother. Proffitt's conduct in dealing with this adverse witness would have possibly violated several rules of professional conduct, according to the district court, including Illinois Rules of Professional Conduct 1.2, 1.7, 3.4 and 4.3. The court found that considering the circumstances as a whole, Proffitt's conduct compromised Combs' right to conflict-free representation and impermissibly tainted any trial outcome. In particular, the court found that Proffitt had given legal advice to Temelcoff. Because of the nature and level of Proffitt's involvement with Temelcoff, the court was concerned that Proffitt may have been ethically constrained in his cross-examination of Temelcoff at Combs' trial. The court also determined that Proffitt's conduct called into question the integrity of the court, and gave rise to a possible attack on the basic fairness of the proceeding. Specifically, the court was concerned that by allowing Combs to go forward with Proffitt as his attorney, Combs would have a built-in appealable issue about his Sixth Amendment right to conflict-free counsel. See January 25, 1999 Order; Tr. at 164-196.

The court found that Combs refused to waive potential conflicts, even though the court had admonished him that his refusal to waive the conflicts would result in a mistrial. The court found that Combs did not object to the mistrial, either before or after the court declared the mistrial, and he therefore impliedly consented to the court's ruling. The district court framed the issues for analyzing Comb's double jeopardy claim as threefold: whether the mistrial was proper, whether Combs objected, and if he did object, whether the mistrial declaration was based on manifest necessity. The court held that the mistrial was proper because Proffitt's conduct tainted the judicial proceedings in a way that undermined both the public's and the defendant's interest in a fair trial. This taint was caused by Proffitt's misconduct, and the taint affected the proceedings to such an extent that it outweighed Combs' interest in having the counsel of his choice and in having the impaneled jury decide his case. The court found further that had it failed to declare a mistrial, Combs would have an opportunity on appeal to have his conviction reversed because of his counsel's conflict of interest and misconduct. Moreover, Combs impliedly consented to the mistrial by failing to object when given the opportunity, and thus the mistrial was appropriate. The district court acknowledged that had Combs objected, retrial would have been prohibited by the double jeopardy

clause unless there was a manifest necessity for declaring the mistrial. The district court found that even if Combs had objected, the mistrial was manifestly necessary because of the taint in the proceedings that undermined the ends of justice and because Combs would have had an opportunity on appeal to challenge his conviction on the ground that his attorney was under a conflict of interest. Therefore, the district court denied the motion to dismiss the indictment, and Combs proceeded to the second trial. That second jury convicted Combs and the district court sentenced him to 192 months of imprisonment. Combs appeals.

II.

Combs raises four challenges to his conviction. First, he argues that his second trial violated the double jeopardy clause of the Fifth Amendment because the mistrial was not manifestly necessary. Second, he contends that the district court's dismissal of his trial counsel violated his Sixth Amendment right to the counsel of his choice because the conflict of interest noted by the district court was too remote or minimal to justify the dismissal. Third, he claims that his confession should have been suppressed because he made incriminating statements to the police before he was given his Miranda rights. Finally, he complains that the evidence at trial was insufficient to convict him of possession with intent to distribute methamphetamine because the government lacked evidence that he distributed or intended to distribute the methamphetamine in his possession.

A.

The double jeopardy clause bars retrial unless the district court's mistrial declaration was occasioned by manifest necessity or consented to by the defendant. Camden v. Circuit Court of the Second Judicial Circuit, Crawford County, Illinois, 892 F.2d 610, 614 (7th Cir. 1989), cert. denied, 495 U.S. 921 (1990). We turn first to the question of whether Combs consented to a mistrial. Either express or implied consent will suffice to overcome the bar to retrial so long as there is no governmental or judicial conduct intended to goad the defendant into assenting. Camden, 892 F.2d at 614. Here, the court addressed Combs directly after determining that Proffitt labored under the appearance of a conflict if not an actual conflict of interest. The court gave Combs an opportunity to consult with Proffitt, and then asked if he would waive his right to conflict-free representation. Combs refused to waive that right, and told the court he nonetheless wished to have Proffitt represent him. The court then declared a mistrial and

dismissed Proffitt. Neither Combs nor his attorney objected to the mistrial declaration. Combs asked for clarification of what his attorney had done wrong, and the court explained again that Proffitt had given legal counsel to Temelcoff, the government's key witness against him, and that this representation of the main witness against Combs created a conflict of interest. The court clarified that because of this conflict, the court would not allow Proffitt to continue to represent Combs, and that without a waiver, the court intended to start a new trial in two to three months with new counsel for Combs. The court asked Combs if he understood, and Combs indicated that he did. Proffitt made no statement other than to inform the court that Combs could find new counsel "within a couple of weeks." Neither Proffitt nor Combs indicated any disagreement with the declaration of a mistrial.

Nonetheless, we are reluctant to construe this silence as consent to a mistrial under these unusual circumstances. At the time when he could have registered an objection to the mistrial, Combs was represented by an attorney who had engaged in the conduct giving rise to the mistrial. The district court found that it could not proceed unless Combs waived his right to conflict-free representation, and Combs refused to waive that right. We cannot construe his silence against him under those circumstances. Furthermore, Combs stated emphatically that he did not want to waive any of his rights, and this statement could serve as a layman's objection to the mistrial. Nor may we construe Proffitt's silence as consent to the mistrial because Proffitt quite possibly labored under a conflict of interest and had created the very situation giving rise to the mistrial. Finally, both Proffitt and Combs vigorously objected to Proffitt's dismissal, and once Proffitt was dismissed, they had no viable objection to the mistrial itself. Obviously, the trial could not go forward until Combs secured a new attorney. Under these circumstances, we will construe Combs' objection to the dismissal of his attorney as his objection to the mistrial declaration.

We turn then to manifest necessity. We judge manifest necessity by examining the reason for the mistrial itself, and not the event that triggered the mistrial. United States v. Buljubasic, 808 F.2d 1260, 1265 (7th Cir. 1987), cert. denied, 484 U.S. 815 (1987). In this case, for example, it was obviously not manifestly necessary for Proffitt to represent both the defendant and the star witness against him. The question is whether the mistrial itself was manifestly necessary once the court determined that Proffitt engaged in that questionable

conduct. Our discussion of consent lays out the Catch 22 in which the district court found itself. Because of Proffitt's conduct, the validity of the verdict would have been in question whether or not the court allowed Proffitt to continue his representation of Combs. If the court dismissed Proffitt, Combs could complain that he was denied the counsel of his choosing. If the court accepted Combs' waiver of his right to conflict-free representation, Combs could complain that the waiver was invalid and his counsel was ineffective. The court was also concerned about the fact that Combs' mother was funding legal representation for her son and for the star witness against him. Adding to the court's apprehension was the fear that Proffitt would be ethically constrained in cross-examining Temelcoff because he had previously given her legal advice. As the district court aptly noted, "[t]he situation, you know, smells to high heaven." Tr. at 189.

Under the manifest necessity standard, a court may declare a mistrial only if a "scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." Camden, 892 F.2d at 614 (quoting United States v. Jorn, 400 U.S. 470, 485 (1971)). The Supreme Court has described the "ends of public justice" as "the public's interest in fair trials designed to end in just judgments." Illinois v. Somerville, 410 U.S. 458, 463 (1973) (quoting Wade v. Hunter, 336 U.S. 684, 689 (1949)). Whether this standard can be met must be determined on a case-by-case basis. Camden, 892 F.2d at 614. Here the district court found that the proceedings had been tainted by the conduct of the defendant's lawyer. The court concluded that this misconduct opened the door to a reversal on appeal under either of the two theories described above.

A trial judge properly exercises his discretion to declare a mistrial if . . . a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial. If an error would make reversal on appeal a certainty, it would not serve the "the ends of public justice" to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court.

Somerville, 410 U.S. at 464. We agree with the district court's assessment that this was such a case. Once Combs refused to waive his right to conflict-free representation, it served no purpose to proceed to a verdict that would surely

be overturned on appeal. United States v. Cyphers, 553 F.2d 1064, 1068 (7th Cir. 1977), cert. denied, 434 U.S. 843 (1977) (even where a reversal was not a certainty, the defendant's ability to present a sufficiently meritorious claim for reversal may support a trial judge's decision that the ends of public justice would be better served by a mistrial). Finally, even though Combs did not request the mistrial and did not consent to it, "the mistrial was surely ordained for his benefit. He can hardly complain that he was 'penalized' by the district court's vigilant regard for his right to a fair trial." Cyphers, 553 F.2d at 1068./2 Therefore, we affirm the district court's judgment that the mistrial was occasioned by manifest necessity. The retrial was thus not barred by the double jeopardy clause.

B.

    As the district court predicted, Combs' next challenge is based on his Sixth Amendment right to the counsel of his choosing, a right he claims was violated when the court dismissed Proffitt and required him to proceed with new counsel. We review for abuse of discretion the district court's decision to remove Proffitt from his representation of Combs. United States v. Spears, 965 F.2d 262, 275 (7th Cir. 1992). Although every defendant has a right to the attorney of his choosing, that right is not absolute. United States v. Vasquez, 966 F.2d 254, 261 (7th Cir. 1992). The Sixth Amendment also entitles defendants to representation by an attorney unfettered by any conflict of interest. United States v. Lowry, 971 F.2d 55, 59 (7th Cir. 1992). Even when a defendant is willing to waive a conflict of interest, a court has an independent duty to balance the right to counsel of choice with the broader interests of judicial integrity. Vasquez, 966 F.2d at 261. The court is required to take action to protect the defendant's right to effective assistance of counsel unless, after inquiry, the court believes that a conflict of interest is unlikely to arise. Id.; Lowry, 971 F.2d at 59 (Sixth Amendment right to counsel of defendant's choosing and right to conflict-free representation may at times clash with each other).

    This situation arises most often in the context of a single attorney representing co-defendants, but we think the principles are equally applicable here where Temelcoff was the primary witness against Combs, and was herself implicated by having accepted delivery of the package of drugs at her home. Lowry, 971 F.2d at 59-60. Generally, a defendant may not insist on the counsel of an attorney who has a previous or

ongoing relationship with an opposing party. Wheat v. United States, 486 U.S. 153, 159 (1988). Joint representation is suspect because ethical constraints may prevent the attorney from vigorous defense of the client. Wheat, 486 U.S. at 160. For example, a conflict may prevent an attorney from challenging admission of evidence prejudicial to one client but perhaps favorable to another. The conflict may hamper the attorney at sentencing from arguing that one client is less culpable than another. Wheat, 486 U.S. at 160. Or, as the court feared in Combs' case, a conflict may prevent an attorney from vigorously cross-examining one client to the detriment of another. The court must determine this potential for conflicts not with the luxury of hindsight but in the murkier context of the pre-trial proceedings, or, as happened in this case, during the trial itself. See Wheat, 486 U.S. at 162-63.

Here the district court carefully detailed the potential for a conflict, and the taint in the fairness of proceedings occasioned by Proffitt's conduct. The court found that Proffitt advised Temelcoff to hire an attorney, that he located an attorney for her and that he arranged to have the defendant's mother pay for that attorney. Moreover, the court found that the fees to pay Temelcoff's attorney were funneled through Proffitt, and that Proffitt advised Temelcoff to testify truthfully at trial. The court anticipated from the opening statements that Combs' defense was going to be that the drugs belonged to Temelcoff, and that Temelcoff was going to testify that the drugs belonged to Combs. In combination with the fact that Combs' mother paid for both her son's lawyer and the lawyer representing the chief witness against him, the court found that the appearance of a conflict if not an actual conflict clouded Proffitt's representation of Combs. The court carefully explained the nature of the conflict to Combs in open court, and Combs refused to waive his right to conflict-free representation.

Combs cannot have it both ways. He now claims there was no conflict sufficient to deprive him of the attorney of his choice, and yet he refused to waive any conflict when given the opportunity. We cannot say that the district court abused its discretion in finding that it could not allow Proffitt to continue as Combs' attorney under the circumstances. Combs wanted an unconflicted attorney and also wanted Proffitt to be that attorney. Because of Proffitt's conduct, that was impossible. When Combs refused to waive the conflict, the court had no choice but to appoint new counsel for Combs and proceed to a second trial. In order that the judgment remain intact on appeal, the district court enforced Combs'

right to effective assistance of counsel. See Wheat, 486 U.S. at 161 (district courts may be whip-sawed by assertions of error no matter which way they rule in the situation of multiple representations). The district court here acted scrupulously in its protections of the defendant's rights. It did not abuse its discretion in doing so.

C.

We next consider whether the district court erred when it refused to suppress Combs' confession on the grounds that the police officers did not inform him of his Miranda rights before obtaining his statement. In the district court, Combs claimed that his statement was involuntary because the police officers continued to question him after he requested an attorney. The district court held a hearing on that claim and concluded that Combs never unequivocally asked for an attorney and that the officers' continued questioning of him under the circumstances was reasonable. In the course of its order on that matter, the court stated that "at some point during his custodial interrogation, Combs was given Miranda warnings." August 5, 1998 Memorandum and Order, at 7. On the basis of that statement, Combs now argues that there was no clear finding by the district court as to when Combs was read his rights, and thus no clear finding that he waived those rights before he gave an incriminating statement.

Combs did not raise this issue of the timing of the Miranda warnings in his motion to suppress before the district court. We therefore review his claim for plain error. Fed. R. Crim. Pro. 52(b). Implicit in the district court's finding that Combs waived his rights is a finding that the officers advised Combs of his rights before interrogating him. The district court's Order would be nonsensical if the district court believed Combs' testimony that the officers did not advise him of his rights until after questioning had begun and after Combs had claimed ownership of the package of methamphetamine. After all, as the district court correctly noted in its Order, statements gathered without Miranda warnings are irrebuttably presumed to be involuntary and thus inadmissible. See August 5, 1998 Memorandum and Order, at 4; Oregon v. Elstad, 470 U.S. 298, 306-07 (1985). Yet the district court found that Combs' statements were voluntary because he received the Miranda warnings and continued to talk to the police after indicating an understanding of his rights. We review de novo the district court's finding that Combs' Miranda waiver was voluntary, but our review of the district court's findings of

historical fact is deferential. United States v. Westbrook, 125 F.3d 996, 1001 (7th Cir. 1997), cert. denied, 522 U.S. 1036 (1997). We will not reverse the district court's findings of historical fact absent clear error. Id. The only error that Combs claims is that the court did not make a specific finding that the warnings were given before any interrogation occurred. Because such a finding was implicit in the district court's order, and readily apparent from a careful reading of that order, we find no error.

D.

We turn finally to Combs' claim that the evidence was insufficient to prove that he had the intent to distribute the methamphetamine. He does not challenge the sufficiency of proof on the possession prong of the statute. Combs faces a formidable hurdle to successfully challenge the sufficiency of the evidence. See United States v. Van Dreel, 155 F.3d 902, 906 (7th Cir. 1998). Viewing the evidence in the light most favorable to the government, we reverse only if the record contains no evidence from which the jury could find guilt beyond a reasonable doubt. Id. Combs acknowledged ownership of a package containing 616 grams of methamphetamine. A jury may infer intent to distribute when the amount found in the defendant's possession greatly exceeds the amount normally possessed for personal use. United States v. Velasquez, 67 F.3d 650, 653 (7th Cir. 1995). Combs could not seriously argue that he intended to personally consume more than a pound of methamphetamine, or that a jury could not infer intent to distribute from that ponderous amount. The evidence was sufficient for the jury to infer that Combs intended to distribute the methamphetamine.

III.

For the reasons stated above, we therefore affirm the judgment of the district court.

AFFIRMED.

/1 The court asked for clarification and Combs stated, "I don't want to waive none of my rights." Tr. at 193. This declaration is relevant to the government's claim that Combs failed to object to the mistrial.

/2 Obviously, we would reach a different result if the misconduct had been committed by the prosecutor rather than Combs' own counsel. When calculated prosecutorial misconduct necessitates

the mistrial, the double jeopardy clause may bar retrial of the defendant. Cyphers, 553 F.2d at 1068 n.1.